UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:10-CV-00007-R

JOHN M. and MELISSA LAHUTSKY                              PLAINTIFFS

v.

WAGNER MOVING & STORAGE, INC.      DEFENDANT/THIRD-PARTY PLAINTIFF

v.

A&K CONSTRUCTION, INC.                         THIRD-PARTY DEFENDANT

MEMORANDUM OPINION AND ORDER

This matter is before the Court upon the parties' motions for summary judgment.  The

Third-Party Defendant first moved for summary judgment.  DN 43.  All parties have responded

and replied to the Third-Party Defendant's motion.  DN 47, 49, 59, 61.   The Defendant also filed

a separate motion for summary judgment.  DN 48.  The Plaintiff has responded.  DN 57.  The

Defendant has replied.  DN 58.  All of the motions involve the same sets of facts and issues, and

the Court addresses them in this opinion.  Fully briefed, this matter is now ripe for adjudication.

For the following reasons, the Defendant's motion for summary judgment is DENIED, and the

Third-Party Defendant's motion for summary judgment is DENIED IN PART and GRANTED

IN PART.

BACKGROUND

The genesis of this case was a slip and fall occurring on the morning of January 30, 2009,

at 900 Olive Street in Paducah, Kentucky.  At approximately 8:20am on that day, Plaintiff John

Lahutsky ("Lahutsky") slipped and fell down a set of external stairs after exiting an office on the

premises of the Defendant, Wagner Moving & Storage, Inc. ("Wagner").  Lahutsky claims that

his fall and resulting injuries were caused by long, thin patches of ice that were negligently left

1

on the steps by Wagner.  In addition to asserting a negligence claim, Lahutsky alleges that Wagner was negligent *per se* because the stairs did not have a handrail or canopy as required by the Kentucky Building Code.  Melissa Lahutsky has also filed a claim for loss of consortium.

On September 1, 2010, Wagner filed a third-party complaint against A&K Construction, Inc. ("A&K").  In the third-party complaint, Wagner seeks indemnity from A&K for any and all judgment that may be rendered against it in the suit by Lahutsky.  The basis for Wagner's indemnity claim is that it contracted with A&K to construct the stairs at issue, and A&K is solely responsible for any failure to include a handrail or to otherwise follow the Kentucky Building Code.  Because A&K did not follow the building code, Wagner claims that A&K is the party ultimately responsible for any injuries sustained by Lahutsky.

## I.      Facts Concerning Lahutsky's Fall on January 30, 2009.

Lahutsky is a resident of Pennsylvania who, on the date of the fall, was working as a truck driver for New Century Transportation, Inc.  Lahutsky arrived in Paducah on the evening of January 26, 2009.  He was in Paducah to pick up a trailer of goods that was supposed to be in Dallas, Texas on January 30, 2009.  On the morning of January 27, 2009, the first wave of an ice storm hit western Kentucky but did not immediately cause significant problems.  On that morning, Lahutsky went to Wagner's to prepare two other New Century trailers for transport. He could not prepare his own trailer on that date because he was waiting for it to arrive from Louisville, Kentucky.  In the process of preparing the trailers and completing the required paperwork, Lahutsky ascended and descended the stairs at issue in this case three separate times. Lahutsky did not have any problems traversing the steps on the 27th and was not aware of any snow or ice present on the steps that day.  When asked whether he noticed if the steps had a handrail on the 27th, Lahutsky replied, "I'm am able bodied male, so I don't use or need a

2

handrailing.  So I didn't necessarily look to see that there was a handrailing there."  Lahutsky finished his preparations and left Wagner's around noon on January 27th.  From there, Lahutsky went to the Love's truck stop on Interstate 24, just outside of Calvert City, Kentucky.  Lahutsky went to this particular truck stop to retrieve the empty trailer he needed for his trip to Dallas.

On the evening of January 27, 2009, the second wave of what would be a catastrophic ice storm struck Paducah and the surrounding area.  On the morning of January 28th, Lahutsky called his employer and asked them to notify Wagner that he could not pick up his load because the parking lot at the truck stop was "a solid sheet of ice," and he would not be able to travel "until the road conditions improved" because "an empty trailer" and icy roads are a "recipe for disaster[.]"  The conditions were so bad that Lahutsky did not leave the parking lot of the truck stop on Wednesday, January 28th, or Thursday, January 29th.

Conditions in the area began to slowly improve, and Lahutsky finally left the truck stop around 7:30am on Friday, January 30, 2009.  Lahutsky took Interstate 24 into Paducah and arrived at Wagner's around 8:00am.  Lahutsky had no problem crossing Wagner's parking lot that morning and did not see any ice on the bottom landing as he approached the stairs.  Lahutsky observed that the bottom landing, although not icy, had been treated with salt.  As he prepared to ascend, Lahutsky looked at the right-hand side of the stairs ("Side A") and did not see any ice, although he admits the stairs were wet.  This was the first time that Lahutsky ascended the stairs on January 30th, and there was nothing blocking his view of the left-hand side of the stairs ("Side B") as he ascended.  Lahutsky admits that if he would have looked left he could have seen Side B but is adamant that he never looked at Side B while ascending Side A.  Additionally, Lahutsky did not look for or pay attention to whether there was a handrail on this day because he does not "generally use them."  As he topped the stairs, Lahutsky did not see any

3

ice on the top landing.

Having climbed the stairs without incident, Lahutsky entered the office at Wagner's. Once in the office, Lahutsky saw Judy Oakley and at least two other Wagner employees. In addition to these individuals, Lahutsky saw Augusto Paini and at least one other unidentified truck driver. Everyone in the office was waiting to see if Wagner would be adequately staffed in order to be open for business that day. Shortly after Lahutsky entered the office, Wagner decided to open for the day, and Lahutsky and the other drivers received their dock door assignments.

At approximately 8:20am, Lahutsky and another driver, Augusto Paini, left the office with Paini walking behind Lahutsky. As Lahutsky approached the external stairs, another man was coming up Side A, and Lahutsky moved to descend Side B, which was now on his right-hand side. According to Lahutsky, the top landing of the stairs was clear and, as he approached to descend Side B, he was not looking for any ice on the stairs. Lahutsky admits that there was nothing blocking his view of Side B and that nothing would have prevented him from waiting until the man finished ascending Side A so that Lahutsky could descend that side instead of using Side B.

As Lahutsky descended Side B he was looking forward and down the stairs, not directly at his feet, and did not observe any ice on the stairs. Unfortunately, within taking one or two steps down the stairs, Lahutsky's feet slipped out from under him and the middle of his back landed on either the top or second-from-the-stop step. Lahutsky claims that he instinctively reached for a handrail as he began to fall, but, because the stairs did not have one, he could not catch himself and prevent the fall. After falling, Lahutsky slid down the stairs on his back and ended up on his hands and knees on the bottom landing.

4

Immediately after the fall, the truck driver following behind Lahutsky, Augusto Paini, came to Lahutsky's aid. With the help of another man, whom Lahutsky believes came from inside Wagner's office, Paini helped Lahutsky re-ascend the stairs and get to a chair inside the office. As Paini and the other driver were helping Lahutsky climb back up the stairs, he claims to have looked down and observed ice on Side B of the stairs. According to Lahutsky, the ice covered all seven steps of the stairs and extended about two feet from an external retaining wall to the middle of the steps. In addition to being about two feet in length, the ice also covered most of the depth or tread of the stairs. In all, Lahutsky claims Side B of the stairs was completely covered in ice. As Lahutsky reached the top of the stairs he claims to have heard a Wagner employee, Judy Oakley, tell another employee to clear the stairs of the ice.[1]

## II.     Facts Concerning Wagner's Removal of Ice from the Stairs.

Lahutsky observed salt on at least the bottom landing of the stairs at Wagner's on January 30, 2009. In preparation of this case Lahutsky took the deposition of Robert Hollis. Hollis is employed at Wagner as a supervisor and was working during the relevant dates of this case.

Hollis typically arrives before the other employees and, in his discretion, puts salt on the stairs and shovels off snow and ice as is necessary. Clearing the steps is not part of his particular duties as a supervisor, but he takes it upon himself to do so as often as required. Although he only has a specific recollection of putting salt down on Wednesday, January 28, he would have treated the stairs on the other dates in issue "if there was something out there." When he clears the stairs, he clears them "wall to wall" and would have "done them all" on the dates in issue. Base on this testimony, it is apparent that Wagner did not leave the snow and ice on the stairs in its natural state but, at some point between January 28th and January 30th, altered the natural

---

[1] Augusto Paini's wife, Laura, took pictures of the stairs shortly after Lahutsky's fall. The pictures do not show the condition of the stairs immediately after the accident. Instead, the pictures record the condition of the stairs after they had been cleared by the Wagner employee.

condition of the snow and ice present on the stairs.

### III.    Facts Concerning the Construction of the Stairs.

The stairs at issue in this case are located at Wagner's Olive Street facility.  A&K was hired by Wagner to build the stairs, a warehouse, and office space at the Olive Street location sometime between 1990 and 1991.  In August of 1989, prior to construction, Clayton Wagner, then-owner of Wagner, applied for a building permit with the City of Paducah.  The application listed A&K as the "general contractor" on the project.  Also in August of 1989, Clayton received a temporary foundation permit that was conditioned upon his compliance with "all applicable codes, laws, and regulations."  The City of Paducah issued the final building permit on January 10, 1990.  This permit was signed by Clayton and listed A&K as the "contractor."

As part of the building plans, Kenny Hunt, owner of A&K, sketched a drawing of the stairs to be constructed.  This drawing did not include a handrail, but, in his deposition, Hunt stated that he would have expected to put a handrail on the stairs because it likely needed it.  In addition to a handrail, the stairs were initially designed to be covered by an awning or canopy. Neither the handrail nor the covering were ever added to the stairs from the time of construction through Lahutsky's slip and fall on January 30, 2009.  Although Robert Wagner - Wagner's current president and vice-president at the time of construction - has testified that he expected A&K to comply with building codes, he has also indicated that he and his father, Clayton, would have been the ones who made the decision not to enclose or do anything more to the stairs once they were built.  Kenny Hunt testifies that to the best of his recollection the decision not to complete the stairs was an economic one that he assumes was made by Wagner.  Other relevant facts concerning the stairs and the applicable building code are developed in the discussion section below.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity applies the standards of Federal Rule of Civil Procedure 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

**DISCUSSION**

Both Wagner and A&K move for summary judgment claiming Wagner owed no duty to protect Lahutsky from the open and obvious danger presented by the accumulation of ice on the stairs.  Should the Court find that the ice was not open and obvious, A&K independently moves for summary judgment against Wagner, claiming that it should not be required to indemnify Wagner for Lahutsky's injuries.  The Court will address the open and obvious claim and A&K's indemnity defense in turn.

**I.      Open and Obvious Danger.**

The Court has jurisdiction to hear this case because the plaintiff is completely diverse from the defendant and the third-party defendant.  *See* 28 U.S.C. § 1332.  When hearing diversity cases, federal district courts are required to apply the substantive law of the states in which they sit.  *See Erie Railroad v. Tompkins*, 304 U.S. 64 (1938).  In the present case, the Court will apply Kentucky's substantive tort law.

Wagner and A&K move this Court for summary judgment claiming that any danger encountered by Lahutsky on January 30, 2009, was open and obvious and that Wagner had no duty to protect Lahutsky from dangers he could have readily observed and avoided himself.  The Court is not persuaded by this argument for two reasons.  First, the Court finds that there is a genuine issue as to whether the ice was open and obvious in this particular case.  Second, even if the ice was open and obvious, a recent decision by the Kentucky Supreme Court, *Kentucky River Med. Ctr. v. McIntosh*, 319 S.W.3d 385 (Ky. 2010), held that landowners have a duty to use reasonable precautions to protect their invitees from foreseeable injuries caused by open and obvious dangers in certain circumstances, some of which are present in this case.

### A. A Genuine Issue Exists as to Whether the Ice was Open and Obvious.

Prior to the *McIntosh* decision, Kentucky law was "not generous to business invitees who suffer[ed] an injury as a result of a risk created by an obvious, outdoor natural condition such as ice." *Gaff v. Johnson Oil Co.*, 45 Fed. Appx. 499, 501 (6th Cir. 2002). Before *McIntosh*, the general rule was that "natural outdoor hazards which are as obvious to an invitee as to the owner of the premises do not constitute unreasonable risks to the former which the landowner has a duty to remove or warn against." *Standard Oil Co. v. Manis*, 433 S.W.2d 856, 858 (Ky. 1968) ("*Manis* rule"). Of course, the applicability of this bright-line rule turned upon whether the condition was open and obvious. If the condition was open and obvious, a landowner had no duty to protect, but if it was not open and obvious, then the landowner had a duty to use reasonable precautions to protect invitees from injury resulting from the condition.

In Kentucky, a danger is "obvious" when "both the condition and the risk are apparent to and would be recognized by a reasonable man in the position of the visitor exercising ordinary perception, intelligence, and judgment." *Bonn v. Sears, Roebuck & Co.*, 440 S.W.2d 526 (Ky. 1969) (citations omitted). "Whether a natural hazard like ice or snow is obvious depends upon the unique facts of each case." *Schreiner v. Humana, Inc.*, 625 S.W.2d 580, 581 (Ky. 1981).

The Court finds that there is a genuine issue as to whether the ice on the steps in the present case was open and obvious. It should first be noted that Lahutsky was an invitee on Wagner's premises on the morning of January 30, 2009. A person is an invitee if: "1) he enters by invitation, express or implied, 2) his entry is connected with the owner's business or with an activity the owner conducts or permits to be conducted on his land and 3) there is mutuality of benefit or benefit to the owner." *Johnson v. Lone Star Steakhouse*, 997 S.W.2d 490 (Ky. 1999) (citing BLACK'S LAW DICTIONARY 827 (6th ed. 1990)).

Next, the facts show that there is a genuine issue as to whether the ice was open and obvious. Lahutsky admits he was aware of the snowy and icy conditions generally present in the western Kentucky on January 30, 2009. He further acknowledges he saw salt on the bottom landing of Wagner's stairs and that moisture was present on Side A as he ascended the stairs. Although these facts show that Lahutsky was alerted snow and ice in the area, he testified that he had no problem crossing Wagner's parking lot, saw no ice on Side A as he ascended the stairs, and entered the building without slipping on or encountering ice. Lahutsky admits that he did not look at Side B of the stairs as he ascended Side A and that nothing blocked his vision from doing so. He is adamant, however, that he did not look at and had no reason to observe Side B as he was entering the building.

After receiving his dock door assignment, Lahutsky left the office and chose to descend Side B of the stairs because another individual was ascending Side A. Lahutsky was not looking for ice on the stairs because he had ascended them without incident. He admits that nothing blocked his view of Side B as he descended. He never testified, however, that he would have seen the ice had he looked. As he descended Side B, Lahutsky looked forward and down, not directly as his feet. In Kentucky, "[a] person does not have to 'look directly down at [his] feet with each step taken but, in the exercise of ordinary care for [his] own safety, one must observe generally the surface upon which [he] is about to walk.'" *Reece v. Dixie Warehouse & Cartage Co.*, 188 S.W.3d 440, 450-51 (Ky. Ct. App. 2006) (quoting *Humbert v. Audubon Country Club*, 313 S.W.2d 405, 407 (Ky. 1958)).

Lahutsky slipped and fell after descending only one or two steps. August Paini, who was following behind him, immediately checked on Lahutsky, and Paini and another individual helped Lahutsky climb back up the stairs and enter Wagner's office. Lahutsky only noticed ice

10

on the steps for the first time as he was being helped back up the stairs.  Resolving all ambiguities and drawing all inferences in favor of Lahutsky, the Court finds that there is a genuine issue as to whether the ice in this case was open and obvious.  If it was not open and obvious, Wagner was under a duty to take reasonable precautions to protect Lahutsky from conditions he could not readily observe.  Whether Wagner acted reasonably, so as to relieve it of liability in the face of a duty, is a question of fact for the jury to decide.  If the ice was open and obvious, the *McIntosh* decision, discussed below, still required Wagner's to take reasonable precautions because Lahutsky's injuries were foreseeable.  As such, summary judgment is inappropriate because there is a genuine issue as to whether the ice was open and obvious.

In their motions for summary judgment, both Wagner and A&K rely heavily on the Kentucky Supreme Court's decision in *PNC Bank, Kentucky, Inc. v. Green*, 30 S.W.3d 185 (Ky. 2000), and argue its outcome should control in this case.  In *PNC Bank*, Green slipped and fell on an icy sidewalk as she was trying to enter a bank.  *Id.* at 186.  The court overturned a denial of summary judgment by the court of appeals, finding instead that the snow and ice were open and obvious, and PNC Bank did not have a duty to warn or protect under the *Manis* rule.  Most significantly, the court reviewed the evidence and found:

> Green's deposition testimony unquestionably confirms that her visit to the bank was during daylight hours; that she was aware of inclement weather conditions; that she had earlier in the day been forced to walk like she was "walking on eggs" to avoid falling; that she clearly noticed the sidewalk at PNC Bank was icy; and that there was no indication that any measure had been taken to clear the sidewalk.  Green's own testimony dispels any issue as to whether the risk was open and obvious.  Accordingly PNC Bank was entitled to summary judgment.

*Id.* at 187.  *PNC Bank* is factually distinguishable from Lahutsky's slip and fall.  Like *PNC Bank*, Lahutsky fell during daylight hours and was aware of inclement weather conditions in the Paducah area.  Unlike *PNC Bank*, Lahutsky had no problem crossing Wagner's parking lot and

11

ascended the stairs without slipping.  Furthermore, unlike *PNC Bank*, Lahutsky's testimony is that he did not see any ice *before* he fell, and thus there is no indication that he could have avoided a danger he did not know existed.  Green's own testimony in *PNC Bank* demonstrated that the snow and ice were an open and obvious in that case.  On the contrary, Lahutsky did not see any ice until after he fell.  As stated above, whether ice is open and obvious depends on the facts of each case.  *See Schreiner*, 625 S.W.2d at 581.  The Court finds that *PNC Bank* and the present case are distinguishable because the facts of Lahutsky's fall show that there is a genuine issue as to whether the ice was open and obvious.

Although the facts surrounding Lahutsky's fall are distinguishable from *PNC Bank*, they are similar to two other Kentucky cases in which the courts declined to find that ice was open and obvious.  In *Schreiner v. Humana, Inc.*, the plaintiff slipped and fell on an icy walkway while trying to enter a doctor's office.  Snow has previous been removed from the walkway, and Schreiner testified that the walkway looked "perfectly clear" to her.  *Id.* at 580.  Based on Schreiner's testimony, the court found that the ice on the walkway was not an obvious hazard. *Id.* at 581.  In the present case, Lahutsky has testified that the bottom landing, the top landing, and Side A of the steps at Wagner's were clear of ice.  Additionally, Lahutsky did not see any ice on the steps as he descended Side B, although he was not looking directly at his feet.  Drawing all reasonable inferences in favor of Lahutsky, there is a genuine issue as to whether the ice in this case was open and obvious.

In addition to *Schreiner*, the present case is substantially similar to *Estep v. B.F. Saul Real Estate Inv. Trust*, 843 S.W.2d 911 (Ky. App. 1992).  In *Estep*, the plaintiff slipped and fell on an icy sidewalk while trying to enter a shopping mall.  Estep fell in daylight and was generally aware of inclement weather conditions in the area.  *Id.* at 912.  The sidewalk on which

12

the plaintiff slipped and fell appeared to have been cleared except for a "thin skiff" of snow that had recently fallen. *Id.* This thin coating of snow concealed ice that had not been removed from the sidewalk and that could not be readily observed by Estep. The court declined to apply the *Manis* rule, and summary judgment was inappropriate, because "there [was] a genuine issue of fact relating to the parties [sic] knowledge of the ice . . . ." *Id.* at 914. In addition to finding a genuine issue as to obviousness, the court placed emphasis on the fact that the defendants or their agent had attempted to remove the snow and ice. *Id.* The court acknowledged the *Manis* rule but found that "when an owner chooses to remove ice and snow, he must act reasonably[.] The question of whether they acted reasonably is a classic jury question, which precludes summary judgment." *Id.* at 914-15.

The current case is similar to *Estep*. The Court previously found that there is a genuine issue as to whether the ice on the steps was open and obvious. In addition to this finding, there is evidence that Robert Hollis or some other Wagner employee attempted to clear the snow and ice sometime between January 28th and January 30th. Because Wagner attempted to remove the snow and ice, the question becomes whether it did so reasonably, and as *Estep* shows, reasonableness is a question for the jury to decide.[2]

In summary, the Court finds that there is a genuine issue as to whether any ice on Wagner's stairs on January 30th was open and obvious. Lahutsky's own testimony shows that although he knew there was bad weather in Paducah and the surrounding area, he had no knowledge of the ice before he slipped and fell. In addition, there is evidence that Wagner attempted to remove snow and ice from the stairs, and once it undertook efforts to remove the

---

[2] A landowner cannot be liable for injuries caused by an open and obvious danger the landowner tried to ameliorate so long as the landowner's efforts did not make the condition worse or otherwise hide the danger from the invitee. *See PNC Bank v. Green*, 30 S.W.3d 185, 187 (Ky. 2000). This rule does not apply in the present case, however, because the Court has found that there is a genuine issue as to whether the ice was open and obvious. As such, Wagner had to act reasonably to correct the unobservable dangers on the premises.

snow and ice, it was under a duty to act reasonably in doing so.  Whether Wagner acted reasonably is a question for the jury that renders summary judgment inappropriate.  Because summary judgment is inappropriate, Wagner's and A&K's motions for summary judgment on the issue of whether the ice was open and obvious are denied.

### B.  Even if Open and Obvious the McIntosh Decision Renders Summary Judgment Inappropriate in this Case.

The Court has found there is a genuine issue as to whether the ice at issue in this case was open and obvious.  Even if the ice was open and obvious, summary judgment would still be inappropriate in light of the Kentucky Supreme Court's recent decision in *Kentucky River Med. Ctr. v. McIntosh*, 319 S.W.3d 386 (Ky. 2010).[3]

The *McIntosh* Court modified the open and obvious danger rule to make it more compatible with the comparative fault regime that governs Kentucky tort cases.  *McIntosh* arose when a paramedic tripped and fell over an unmarked curb outside of the emergency room at the defendant's hospital in Breathitt County, Kentucky.  *Id.* at 387.  At the time of the fall, McIntosh was helping rush a patient into the emergency room, and her "attention was not focused on the curb; rather she remained focused on attending the critically ill patient." *Id.*  McIntosh suffered a fractured hip and a sprained wrist as a result of the fall.  *Id.*  The defendants moved for summary judgment and later for judgment notwithstanding the verdict, arguing that "the open and obvious doctrine barred McIntosh's recovery as a matter of law." *Id.* at 388.  Their motions were denied by the trial court and denial was affirmed by the court of appeals.  *Id.*  The Kentucky Supreme Court granted discretionary review on the issue of "whether the open and obvious doctrine

---

[3] Justice Schroder, dissenting in *McIntosh*, specifically envisioned that *McIntosh* would alter the analysis in slip and fall cases involving snow and ice.  *Kentucky River Med. Ctr. v. McIntosh*, 319 S.W.3d 386, 397 (Ky. 2010) (Schroder, J., dissenting) ("Now, even though the alleged danger is open and obvious (like snow or ice on a sidewalk), if the possessor can anticipate the harm to an invitee, the possessor has a duty to fix the condition, or to somehow give additional warnings.").

should have completely barred McIntosh's cause of action." *Id.*

Ultimately, the court affirmed the lower courts' rulings. *Id.* at 397. In doing so, however, the court modified Kentucky's open and obvious danger doctrine by adopting Restatement (Second) of Torts § 343A(1).[4] Before *McIntosh*, the issue of an open and obvious danger was a question of law by which courts determined whether a defendant had a duty to warn or protect an invitee from a condition on the premises. If found to be open and obvious, the landowner was absolved of any duty to warn or protect his invitees from the condition under the theory that both parties have equal knowledge when the danger is "truly open and obvious." *Id.* at 390. Because the landowner had no duty, he could not be liable for any injuries resulting from the open and obvious condition.

After *McIntosh*, however, "lower courts should not merely label a danger as 'obvious' and then deny recovery. Rather, they must ask whether the land possessor could reasonably foresee that an invitee would be injured by the danger." *Id.* at 392. Where "the land possessor can foresee the injury, but nevertheless fails to take reasonable precautions to prevent the injury, he can be held liable." *Id.*

After holding that landowners can be liable for foreseeable injuries caused by open and obvious dangers against which they failed to take reasonable precautions, the Kentucky Supreme Court detailed three specific circumstances in which injury is foreseeable. The first circumstance, and the one most at play in *McIntosh*, is where it is foreseeable that an invitee will be distracted from the danger even though it is open and obvious. *Id.* at 393 (citing RESTATEMENT (SECOND) OF TORTS § 343A cmt. f (1965)). It was undisputed that McIntosh was aware of the curb she tripped over because she had previously transported more than 400 patients

---

[4] "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." RESTATEMENT (SECOND) OF TORTS § 343A (1965).

through the same emergency room entrance. *Id.* at 387. Despite this fact, her injury was foreseeable to the defendant hospital because of distractions associated with her job. *Id.* at 393. When rushing critically ill patients into the hospital, McIntosh was required to attend to their needs and could not watch her every step. *Id.* As a result, the hospital was under a duty to take reasonable precautions to prevent McIntosh's injuries in the face of the open and obvious danger. *Id.*

The second circumstance in which a landowner can be liable to an invitee for foreseeable injuries caused by an open and obvious danger is where "'the possessor has reason to expect that the invitee [] . . . will forget what he has discovered.'" *Id.* at 394 (quoting RESTATEMENT (SECOND) OF TORTS § 343A cmt. f (1965)). The evidence in *McIntosh* showed that the particular emergency room entrance at issue was different from all the other emergency room entrances used by McIntosh in the region. *Id.* Again the court found that the high-stress nature of McIntosh's job could cause her to forget that this particular emergency room entrance was different than the others, that the injury was foreseeable, and that the defendant hospital was required to take reasonable precautions to prevent the injury. *Id.*

Finally the court found that injuries resulting from open and obvious dangers are foreseeable where "'the possessor has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 343A cmt. f (1965)). Applying this circumstance to the facts before it, the *McIntosh* Court found:

> Even if we assume that [McIntosh] was neither distracted nor forgetful about the curb, we would still have to conclude that the benefits of her rushing to the door (at the risk of tripping over the curb) outweighed the costs of her failing to do so (at the risk of the patient's conditioning worsening, perhaps to the point of death, on the [h]ospital doorstep).

*Id.* Where it is foreseeable to the landowner that the benefit of knowingly encountering the open and obvious danger outweighs the risk of doing so, the landowner must take reasonable precautions to prevent an invitee from being injured. *Id.*

Even if the ice Lahutsky encountered in the present case was open and obvious, Wagner would still have a duty to use reasonable precautions to prevent Lahutsky's injuries because they were foreseeable under at least two of the three circumstances outlined in *McIntosh*. First, if the ice was open and obvious, it was foreseeable that Lahutsky could have been distracted while encountering it on the stairs. According to Lahutsky, he chose to descend Side B of the stairs immediately before he fell because another individual was ascending Side A. It was foreseeable to Wagner that Lahutsky would descend the ice-covered side of the stairs because he was distracted by another individual ascending the cleared portion of the stairs.

In addition to distraction, Lahutsky's injuries were foreseeable to Wagner because, if the ice was open and obvious, the facts show that Lahutsky could have forgotten the danger he encountered. Lahutsky arrived at Wagner's around 8:00am on January 30, 2009, and entered the office shortly thereafter. Lahutsky had to wait to receive his dock door assignment while Wagner was deciding whether or not it would be open for business that day. After Wagner decided to open and gave Lahutsky his dock door assignment, Lahutsky exited the office and descended the stairs around 8:20am. It was foreseeable to Wagner that Lahutsky would forget the presence of the ice during his twenty minute wait because of the many other decisions being made at that time. Lahutsky had to wait for Wagner to decide to open and then had to wait for his door assignment. The Court finds that this is sufficient to show that Lahutsky could have forgotten that presence of the ice on the steps if it had been open and obvious.

Under the rule of *McIntosh*, Wagner had a duty use reasonable precautions to protect

Lahutsky from foreseeable injuries resulting from an open and obvious danger on the premises. The Court finds that, if the ice was open and obvious, it was foreseeable that Lahutsky might be injured because he was distracted from the danger or forgot its presence.  As a result, even if the ice was open and obvious, Wagner was not relieved of its duty to protect Lahutsky.  The stairs were there for ingress and egress.  It certainly was foreseeable that invitees would use the entire width of the steps.  The testimony indicates that only Side A had been completely cleared of ice. Wagner argues that the ice on Side B was open and obvious. If so, it was open and obvious to Wagner.  Wagner had the duty to clear.  It was foreseeable that invitees descending would use Side B and could encounter others using Side A.  It was foreseeable that an invitee using Side A, which was clear as he entered, may not notice the condition of Side B.  Simply put this is a case of comparative fault.  Wagner was required to use reasonable precautions to prevent the injury, and whether Wagner acted reasonably is a question for the trier of fact that renders summary judgment inappropriate.  Even if the ice was open and obvious, both Wagner's and A&K's motions for summary judgment would be denied because Lahutsky's injuries were foreseeable under the rules developed in *McIntosh*.

## II.    Indemnity

In addition to arguing for application of the open and obvious danger doctrine, A&K moves for summary judgment on the issue of common law indemnity.  Wagner filed a third-party complaint asserting that A&K must indemnify Wagner for any judgment rendered against it in the suit by Lahutsky.  Wagner claims that it should be indemnified by because Lahutsky's injuries were the result of A&K's failure to install a handrail or cover the stairs with an awning as required by the building code applicable at the time of construction.  In response, A&K moves for summary judgment on multiple grounds, arguing that as a matter of law it should not be

required to indemnify Wagner.  The Court addresses each of A&K's arguments in turn.

A&K first argues that it is not required to indemnify Wagner for Lahutsky's injuries because the Kentucky Building Code "was enacted for the purposes of establishing standards for construction of buildings and was not established for the purpose of setting standards in a negligence lawsuit."  In support of its argument, A&K relies on *Harter v. Roetting*, 2002-CA-001040-MR, 2003 Ky. Unpub. LEXIS 1289 (Ky. App. Dec. 12, 2003).  *Harter* involved personal injuries resulting from a fall on stairs during daylight hours.  *Id.* *3-4.  The plaintiff, a social guest of the defendants (a licensee under Kentucky law), sued the defendants for negligence *per se* because the stairs were not in compliance the building code.  The court rejected the plaintiff's argument because in order to assert a claim for negligence *per se* "the plaintiff must be a member of the class of persons intended to be protected by the regulation," and "a licensee[] is not within the class of persons the state building code was intended to protect."  *Id.* at *5 (citation omitted).  Citing KRS § 198B.050, the court said that the purpose of the building code was to establish "standards for the construction of buildings," not the protection of individuals.  *Id.*  The court declined to conclude that "the injury of a licensee subsequent to the construction of the building is an injury the building code was designed to prevent."  *Id.* at *6.

The Court declines to follow *Harter* for two reasons.  First, *Harter* is distinguishable from the present case because *Harter* involved a licensee entering a private residence at the invitation of the landowner for a social engagement.  Lahutsky, in the present case, was a business invitee entering the premises of a business open to the public.  Because the situation presently before the Court is distinct from *Harter*, the case is not controlling.  Second, the *Harter* Court relies on KRS § 198B.050 for the proposition that the building code "has the purpose of establishing standards for construction of buildings," not the protection of individuals.  *Id.*5-6.

While it is true that KRS § 198B.050(3)(a) provides that the building code "shall [p]rovide uniform standards and requirements for construction and construction materials," the *Harter* Court's reading of the statute ignores or overlooks a subsection following immediately after the above-quoted language.  KRS § 198B.050(3)(c) expressly provides that the building code "shall [p]rotect the public health, safety, and welfare within the state."  In a case after *Harter* involving the question of whether a party could contractually waive the applicability of the building code in a real estate sale, the Kentucky Court of Appeals clearly stated that the "Building Code protects both the public generally and the individual and also promotes the public policy of implementing uniform construction standards statewide."  *Edwards v. Hambel*, No. 2003-CA-000940-MR, 2005 Ky. App. Unpub. LEXIS 260 (Ky. App. Nov. 23, 2005).  Unlike *Harter*, *Edwards* gives meaning to all the subsections of KRS § 198B.050, and KRS § 198B.050(c)(3) clearly states that the building code "shall protect the public health, safety, and welfare within the state."  The Court is not bound by *Harter* in the present case.

A&K's next argument in favor of summary judgment is that indemnity is inappropriate because Wagner acquiesced to the absence of a handrail or canopy by occupying the premises for eighteen (18) years and chose not to install a handrail or canopy because of the associated expense.  In support of this position A&K relies on the Restatement (First) of Restitution § 95 as discussed in *Fox v. CSX Transp.*, 2010 U.S. Dist. LEXIS 130620 (E.D. Ky. 2010).  Although the *Fox* Court discussed § 95's applicability to common law claims of indemnity, it ultimately held that the express indemnity provisions in the contracts at issue governed.  Thus, although § 95 was discussed in *Fox* it was not actually applied, and the court did not cite any Kentucky decisions where it had been adopted.  The Court in the present case has conducted its own search for application of § 95 by the Kentucky courts and has not found any mention of the provision in

Kentucky case law.  Because § 95 has not been interpreted by the Kentucky courts, the Court declines to apply it in this case.

A&K next asserts that Wagner's indemnity argument fails because Kentucky's statute of limitations for common law indemnity claims has tolled.  Relying on *Affholder, Inc. v. Preston Carroll Co. Inc.*, 27 F.3d 232 (6th Cir. 1994), A&K argues that the five (5) year statute of limitations on common law indemnity claims provided for in KRS § 413.120 began to run as soon as Wagner had sufficient notice of its potential liability, which occurred long before Lahutsky filed his case.  For the purposes of this argument, A&K claims that Wagner knew or should have known of its potential liability arising from the lack of a handrail or canopy over the stairs on the day it look possession of the building in 1991.  The Court is not persuaded by A&K's statute of limitations argument because it misconstrues *Affholder*.

In *Affholder*, the Sixth Circuit Court of Appeals certified several issues of Kentucky law to the Kentucky Supreme Court, including a question regarding what statute of limitations should be applied to a third-party indemnity claim.  *Affholder*, 27 F.3d at 233.  According to the supreme court, "it was not until the [plaintiff's] action was filed that the [defendants] had sufficient notice of potential liability.  Until such time as [the plaintiff] sought relief, any indemnity claim by the [defendants] was purely speculative because their potential for liability was purely speculative and very possibility non-existent."  *Id.*  Overall, "[t]he appropriate five year statute of limitations pursuant to KRS § 413.120 for an indemnity claim by the [defendants] against the [third-party defendants] began to run with the filling of [the plaintiff's] action against [the defendants] . . . ."  *Id.*

The quoted portions of *Affholder* show that A&K's reliance on this case is misplaced.  In *Affholder*, the Kentucky Supreme Court specifically ruled that the statute of limitations for

21

indemnity claims could not begin to run until the plaintiff filed its lawsuit.  Likewise in the present case, the applicable statute of limitations did not run until Lahutsky filed his case.  After notice of the lawsuit, Wagner filed its third-party complaint seeking indemnity from A&K well before the close of the five year window.  Wagner's indemnity claim will not be barred by KRS § 413.120.

Finally, A&K argues that Wagner is not entitled to indemnity because Wagner is *in pari delicto* for Lahutsky's injuries that were the result of non-compliance with the building code. "[T]he right to indemnity is of common law origin and is available to one exposed to liability because of the wrongful act of another with whom he/she is not in pari delicto." *Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 780 (Ky. 2000).

In response to A&K's claim that Wagner was *in pari delicto* as to the building code violations, Wagner relies upon *Brown Hotel Co. v. Pittsburg Fuel Co.*, 224 S.W.2d 165 (Ky. 1949), to show that it should be indemnified by A&K.  *Brown* is a classic example of one defendant being entitled to indemnity from another because the first was not *in pari delicto* with the negligence alleged.  In *Brown*, a pedestrian was injured when an employee of the defendant fuel company left a manhole cover loose on the hotel's premises.  *Id.* at 166.  At trial, the verdict against the hotel and the fuel company specified that they should each pay half of the judgment. *Id.*  The hotel later sought and was granted indemnity from the fuel company.  *Id.* at 405.

> The primary, efficient and direct cause of the accident was the positive antecedent negligence of the fuel company's employee in failing to replace the manhole lid securely.  This exposed the hotel company to liability.  Its fault was a negative tort in failing to check upon the act of the coal delivery man and in failing to observe its affirmative duty to the public to see that the way was free of obstruction or the pitfall.  Both were in fault but not the same fault toward the party injured.  The employees of the two companies were not acting jointly or concurrently or contributorily in committing the tort.  They were not in pari delicto.

22

*Id.* at 167.  In short, the fuel company was the primary cause of plaintiff's injuries, and the hotel was entitled to indemnity because it did not act *in pari delicto* with the fuel company in bringing about the plaintiff's injuries.

In the present case, Wagner would have the Court find that it is in the same position of the hotel in *Brown* and not *in pari delicto* for Lahutsky's injuries caused by violations of the building code.  Wagner argues that although it may have been at fault for Lahutsky's injuries, its fault was passive and cannot be equal to A&K's because it lacked A&K's superior knowledge of the building code.  The Court is not persuaded by this argument and finds Wagner *in pari delicto* for any of Lahutsky's injuries that were caused by non-compliance with the building code.  As such, A&K will be granted summary judgment on the issue of indemnity and will not be required to indemnify Wagner for Lahutsky's injuries caused by failure to comply with the building code.

Wagner's role in this case is not like that of the hotel in *Brown*.  The *Brown* Court found that the hotel was not "acting jointly or concurrently or contributorily in committing the tort" suffered by the plaintiff.  *Id.*  Unlike the hotel, Wagner played an active role in any of Lahutsky's injuries that resulted from non-compliance with the building code.  The evidence in this case shows that A&K was hired by Wagner to build the stairs at issue.  The building permit issued to Wagner by the City of Paducah is signed by Clayton Wagner (Wagner's president at the time) and says that it is granted upon the express condition that the construction "shall, in all respects, conform to the Ordinances of this jurisdiction, including Zoning Ordinances, regulating the construction and use of building . . . ."  Thus, Wagner was on alert that the new construction, including the stairs, had to comply with the applicable building code.  In addition to agreeing to comply with the building code regarding construction, Wagner was required by the applicable code to obtain a final inspection of the premises and a certificate of occupancy before taking

23

possession of the building.  In response to Lahutsky's request for admissions, Wagner admits

that it cannot produce a certificate of occupancy, and lack of a certificate shows that Wagner

violated the building code by not obtaining a final inspection before taking possession of the

facility at 900 Olive Street.  In addition to admitting that Wagner did not obtain a certificate of

occupancy, Robert Wagner has testified that he and his father likely made a joint decision not

complete construction of the stairs.

> **Q:**  Okay.  Was there a specific point in time in which there was a decision on
> the part of Wagner Moving to say, "We're not going to do anything more
> to that stairwell.  It's -- we're not going to enclose it.  We're not going to
> put an awning.  Whatever we were thinking about doing we're not doing
> to do anymore"?

> **Wagner:** I would assume that's what happened.

> **Q:**  Was A&K involved in that decision?

> **Wagner:** I don't remember.

> **Q:**  It is possible that that's a decision -- and when you say -- I presume at this
> point was your father making some of the . . . those decisions?

> **Wagner:** He and I together, yes.

Although A&K did not install a handrail or cover the stairs with an awning or canopy

during construction, the evidence described above shows that Wagner shares active fault for not

comply with the building code.  As such, indemnity is inappropriate, and A&K's motion for

summary judgment is granted in regards to the issue of indemnity.

The Court has found that Wagner is *in pari delicto* for Lahutsky's injuries caused by any

failure to comply with the building code and is not entitled to indemnity by A&K on this issue.

In its Response to A&K's motion for summary judgment, Wagner has requested leave to amend

its third-party complaint to assert a claim for contribution against A&K if the Court granted

A&K summary judgment as to indemnity.

24

Under Kentucky law, liability among joint tortfeasors is several only.  *Dix & Assocs. Pipeline Contractors, Inc. v. Key,* 799 S.W.2d 24, 27 (Ky. 1990).  Kentucky does not follow the common law rule that each negligent party may be held entirely responsible for a single indivisible injury.  *Id.*  As a result, one tortfeasor will not be required to pay more than its share of apportioned damages.  Therefore, the Court finds that Wagner is not entitled to contribution from A&K because Wagner is liable for damages it caused.  *See Kevin Tucker & Assocs., Inc. v. Scott & Ritter, Inc.,* 842 S.W.2d 873, 874 (Ky. App. 1992).

The Court has not found that A&K is not responsible for any of Lahutsky's injuries.  It has only found that A&K will not have to indemnify Wagner for those injuries.  If the evidence at trial shows that A&K is responsible for some portion of Lahutsky's damages, then the appropriate remedy is for Wagner to request an apportionment instruction.  *See id.* at 875; *Adam v. J.B. Hunt Transport, Inc.,* 130 F.3d 219, 228 (6th Cir. 1997) ("[I]f there has ever been an active assertion of a claim against the Third-Party - if the Third-Party has been impleaded by the original defendant, in other words - liability can be apportioned to the third-party defendant notwithstanding a dismissal prior to trial.").

In sum, because A&K will not be required to indemnify Wagner for Lahutsky's injuries, A&K will be dismissed from this action.  Nevertheless, Wagner may be entitled to an apportionment instruction at trial because Wagner has actively asserted a claim against A&K.

**CONCLUSION**

Wagner Moving & Storage, Inc., and A&K Construction, Inc., have moved for summary judgment.  For the foregoing reasons, IT IS HEREBY ORDERED Wagner's motion is DENIED, and A&K's motion is DENIED IN PART and GRANTED IN PART.